E-FILED
Wednesday, 23 September, 2026 10:14:41 AM
Clerk, U.S. District Court, ILCD

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE CENTRAL DISTRICT OF ILLINOIS**
**SPRINGFIELD DIVISION**

**NADEJA MALONE, Individually and as Mother and Next Friend of A.P. and N.J., two minors,**
**Plaintiffs,**

**v.**

**KEVIN BYRD, DEREK WILKERSON, TIM COLLIER, JA'MARAE DAVIS, CITY OF SPRINGFIELD, ILLINOIS, an Illinois Municipal Corporation, and WILLIE LEWIS,**

**Defendants,**

**consolidated with**

**DARNELL WILSON, Individually and as Father and Next Friend of K.W., a minor,**

**Plaintiffs,**

**v.**

**DEREK WILKERSON, TIM COLLIER, JA'MARAE DAVIS, CITY OF SPRINGFIELD, ILLINOIS, an Illinois Municipal Corporation, KEVIN BYRD, And WILLIE LEWIS,**

**Defendants.**

**Case Nos. 24-cv-3111**
**24-cv-3115**

## OPINION

**COLLEEN R. LAWLESS, United States District Judge:**

This consolidated action under 42 U.S.C. § 1983 concerns a motor vehicle accident that occurred between Plaintiffs and Defendant Willie Lewis while Lewis was being

pursued by City of Springfield Police Officers. Pending before the Court is the Motion for Summary Judgment filed by Defendants City of Springfield, Derek Wilkerson, Tim Collier, and Ja'Marae Davis. (Doc. 58). For the reasons that follow, Defendants' Motion is Granted.

## I. INTRODUCTION

According to the Complaint, Plaintiff Nadeja Malone resides in Springfield, Illinois, and is the natural mother of N.J., a minor. (Doc. 1, ¶ 4). Plaintiff Stephen Paris is the natural father of A.P., a minor. (*Id.* at ¶ 2). Defendants Derek Wilkerson, Tim Collier, and Ja'Marae Davis were duly appointed sworn law enforcement officers with the Springfield Police Department. (*Id.* at ¶¶ 6-8). Plaintiffs contend Defendant City of Springfield is vicariously liable and statutorily liable on all claims for all awards against Wilkerson, Collier, and Davis. (*Id.* at ¶¶ 10-11). Defendants Kevin Byrd and Willie Lewis are Springfield residents. (*Id.* at ¶¶ 12-13).

In Counts I, II, and III, Plaintiffs assert § 1983 claims against the Defendant officers. (*Id.* ¶¶ 67-79).[1] In Count VII, Plaintiffs assert a claim under *Monell v. N.Y. Dept. of Soc. Servs.*, 436 U.S. 658 (1978) against Defendant City of Springfield. (*Id.* at ¶¶ 79-82). The remaining counts are brought under state law.

[1] In Count IV, Plaintiffs originally asserted a conspiracy claim under 42 U.S.C. § 1985 against Officers Wilkerson, Collier, and Davis but agreed to dismiss the § 1985 claim in their Response to Defendants' Motion for Summary Judgment.

## II. FACTUAL BACKGROUND[2]

On June 9, 2022, less than one month before the pursuit involved in this case, Wilkerson was suspended for his conduct during a police pursuit in February 2022. (Doc. 60, ¶¶ 17, 18). As a result of the Internal Affairs Investigation for the February 2022 pursuit, Wilkerson was ordered to complete re-training on all SPD Pursuit and BWC policies/general orders/legal updates. (*Id.* at ¶ 19). Prior to any re-training on SPD Pursuit or BWC policies as ordered by SPD command staff, Wilkerson was involved in a similar vehicle pursuit on July 7, 2022. (*Id.* at ¶ 20). Before the July 7, 2022 accident, the extent of Wilkerson's training on SPD's pursuit policy was to read the department's policy and procedures manual. (*Id.* at ¶ 21).

On July 7, 2022, Collier and Davis were paired with Wilkerson to perform street crime detail together. (Doc. 58, ¶ 1). Wilkerson was neither officer's supervisor. (*Id.* at ¶ 2). The Street Crimes Unit ("SCU") vehicle was a white, fully marked Ford Explorer with emergency lights. (Doc. 60, ¶ 22). Wilkerson was driving the vehicle and Davis and Collier were passengers. (Doc. 58, ¶ 4). Street crimes is a proactive unit compared to the reactive patrol unit. (*Id.* ¶ 5). Neither Collier nor Davis had been assigned to the SCU prior to July 7, 2022. (Doc. 60, ¶ 23). After Davis and Collier joined Wilkerson on the SCU on July 7, 2022, Wilkerson received a phone call from a member of the Pro Active Crime Unit to be on the lookout for a specific Dodge Challenger. (*Id.* at ¶ 25). Wilson received a

---

[2] Unless otherwise noted, the factual background of this case is drawn from the undisputed facts as conceded to in Defendant's statement of material facts; Plaintiff's response to Defendant's statement of material facts and additional material facts; Defendant's reply to Plaintiff's additional facts; and exhibits to the filings.

picture of the Dodge Challenger and was told to identify the driver, whom the Pro Active Crime Unit suspected was selling drugs. (*Id.* at ¶ 26). Wilkerson spotted the Dodge Challenger parked in front of Jamal's grocery store at Ash and 12th Street. (*Id.* at ¶ 27). The officers parked next to Jamal's where they could see the Challenger and Wilkerson was able to make eye contact with the driver. (*Id.* at ¶¶ 28-29). Wilkerson drove the vehicle and parked in the Dollar General parking lot at 11th and Ash to get a better vantage to watch the Challenger leave Jamal's. (*Id.* at ¶ 30).

The Challenger left Jamal's and Wilkerson exited the Dollar General parking lot and followed the Challenger eastbound on Ash Street. (*Id.* at ¶ 31). Wilkerson believes the driver saw his marked vehicle and "took off." (*Id.* at ¶ 32). Davis also believed the Challenger's driver knew he was being followed by police. (*Id.* at ¶ 33). The officers' purpose was to stop the Challenger and identify its driver. (*Id.* at ¶ 34). Before the Challenger turned north on 14th Street, the officers increased their speed to close the gap between the cars and initiate a traffic stop. (*Id.* at ¶ 35). The parties dispute whether the emergency lights of the police vehicle were activated. (Doc. 60, Resp. ¶ 10).

Wilkerson got close enough to the Challenger that he saw it turn left onto 14th Street. (*Id.* ¶ 36). Wilkerson accelerated to at least 47 mph while traveling east on 14th Street—17 mph above the 30-mph speed limit. (*Id.* at ¶ 37). When Wilkerson saw the Challenger turn right, he described it as seeing "nothing but gravel and dust. And taillights because it's dark outside." (*Id.* at ¶ 39). Wilkerson turned east onto South Street and Davis could see the taillights of the Challenger in front of them. (*Id.* at ¶ 40). Wilkerson testified the Challenger's driver was speeding, driving recklessly, and was a

threat to the public. (*Id.* at ¶¶ 41-42). Davis testified South Street was "bumpy" and was a "crappy" road. (*Id.* at ¶ 43). It had rained that day, and the street lighting was poor. (*Id.* at ¶ 44). Wilkerson recognized that the Challenger was trying to flee from police. (*Id.* at ¶ 46). Collier never lost sight of the Challenger and observed smoke and taillights going up and down. (*Id.* at ¶¶ 47, 48). The Challenger struck the vehicle occupied by Plaintiffs. (Doc. 58, ¶ 11).

Davis testified Wilkerson told him they were not to continue on South Street and turned northbound. (Doc. 60, ¶ 49). When Davis asked why, Wilkerson responded that he thought the car might have crashed. (*Id.* at ¶ 50). When Davis and Collier told Wilkerson they had to go back, Wilkerson stated, "we don't know if the car crashed." (*Id.* at ¶ 51). Davis acknowledged it was their job as police officers to investigate what they believed was a crash that occurred in front of them. (*Id.* at ¶ 52). Wilkerson testified that he saw the Challenger crash and hit the vehicle. (*Id.* at ¶ 53). Davis stated Wilkerson was trying to convince he and Collier that the officers did not see anything that needed to be investigated. (*Id.* at ¶ 54). When Wilkerson refused to return, neither Collier nor Davis reported the crash over the radio. (*Id.* at ¶ 55). As Collier went to grab the microphone for his radio, Wilkerson told him not to call in the crash. (*Id.* at ¶ 56).

When the call of the accident at 17th and South Street came over dispatch, Davis and Collier again tried to convince Wilkerson to drive back to the scene but he refused. (*Id.* at ¶ 57). After receiving witness accounts that the Challenger was being chased by the police prior to the crash, Lt. Ligon called Wilkerson while Collier and Davis were in the car and asked Wilkerson if he was involved in a car chase. Wilkerson denied any

involvement. (*Id.* at ¶ 58). In his interview with Internal Affairs Lt. Robert Markovic, Davis recounted the following statement Wilkerson made in response to his pleas to return to the crash: "No, no we can't do it. We can't do it. No, no, no, we can't . . . **we were chasing that car.** We can't chase that car." (*Id.* at ¶ 60) (emphasis in original). When Davis met with Lt. Ligon at the hospital, he admitted that they "tried to stop this car." (*Id.* at ¶ 62). After Wilkerson went home, he called Lt. Ligon and admitted that he lied and they were trying to make contact with the vehicle in the crash. (*Id.* at ¶ 63).

The statements of Rhonesia Jones and Tyrese Pickett do not appear in the Illinois Traffic Crash Report prepared by Officer Roberts. (*Id.* at ¶ 64). Detective Zajicek reported:

> I was told by Lieutenant Ligon that Tyrese Pickett and Rhonsia [sic] M. Jones had identified themselves to SPD personnel as witnesses to the crash. Preliminary statements given by Rhonisa [sic] Jones and Tyrese Pickett was that the Dodge Charger was being pursued by a SPD patrol car at the time of the crash. I was directed by Lieutenant Graves not to speak with . . . Jones and Tyrese due to the matter being referred to the Illinois State Police.

(*Id.* at ¶ 65). Lt. Ligon's Internal Affairs recorded statement provided:

> And I did contact them [Jones and Pickett] the I think the next working day that I had. And I didn't give them any further details. I had found that the State Police would be following up with the investigation and that they would be hearing from them. I wanted to make sure that we contacted them so that they didn't get antsy and decide to make phone calls on their own.

(*Id.* at ¶ 66).

Wilkerson did not go to the accident scene because of his concern he would be blamed for the pursuit. (Doc. 60, ¶ 15). All officers received consequences for their actions. (*Id.* at ¶ 16). On March 3, 2023, Wilkerson resigned when he learned he would

likely be fired upon the conclusion of an Internal Affairs investigation into his conduct associated with the July 7, 2022 accident. (Doc. 60, ¶ 67).

## III. DISCUSSION

In seeking summary judgment, Defendants contend Plaintiffs' § 1983 substantive due process claims fail because Plaintiffs have not shown that Defendant Officers had a purpose to cause harm or engaged in conduct that "shocks the conscience." Defendants further assert Plaintiffs' *Monell* claims fail because they lack evidence that a City policy caused Plaintiffs' injuries. Plaintiffs contend the Court should use a deliberate indifference standard and find that there is a factual issue as to whether the Defendant Officers acted with deliberate indifference to the safety of the public and Plaintiffs. Furthermore, there is a factual issue as to whether the City is liable under *Monell* for failing to train and discipline officers engaged in dangerous pursuits.

### A. Summary Judgment Standard

Summary judgment is appropriate under Rule 56 if the "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Metzler v. Loyola University Chicago*, 164 F.4th 612, 616 (7th Cir. 2026) (citations omitted). The Court construes all facts and draws all reasonable inferences in favor of the non-movant. *Id.* In considering whether summary judgment is warranted, the Court does not weigh evidence, resolve credibility disputes, or choose between competing factual narratives. *Johnson v. Edwards*,

164 F.4th 1074, 1079 (7th Cir. 2026). The moving party may prevail "by showing an absence of evidence to support the non-movant's claims." *Metzler*, 164 F.4th at 616.

**B. Plaintiffs' Fourteenth Amendment Deliberate Indifference Claims**

In *County of Sacramento v. Lewis*, 523 U.S. 833 (1998), the Supreme Court considered the "standard of culpability on the part of a law enforcement officer for violating substantive due process in a pursuit case." *Id.* at 839. Officers observed a speeding motorcyclist and engaged in a high-speed pursuit for 75 seconds over the course of 1.3 miles in a residential neighborhood. *Id.* at 836-37. The police vehicle and motorcycle reached speeds up to 100 mph with the officer following the motorcyclist at a distance as close as 100 feet. *Id.* at 837. The motorcycle eventually tipped over while making a sharp turn. *Id.* The officer's vehicle skidded into the motorcyclist's passenger at 40 mph, resulting in the passenger's death. *Id.* The Court held that high speed chases involving no intent to harm suspects physically or worsen their legal plight do not result in liability under the Fourteenth Amendment. *Id.* at 853.

Generally, the standard for determining whether a government actor violates an individual's substantive due process rights is whether the violation "shocks the conscience." *Flynn v. Consolidated City of Indianapolis and Marion Cnty.*, 148 F.4th 565, 568 (7th Cir. 2025) (citing *Lewis* 523 U.S. at 846-47). "The Supreme Court has refined this standard and established more specific formulations that apply in emergency and nonemergency situations when police officers cause death." *Id.* at 568. In an emergency situation involving a high speed chase that results in officer-caused death, the standard is intent to harm. *Id.* The standard is deliberate indifference or recklessness in cases of

nonemergency police pursuits resulting in officer-caused death. *Id. Flynn* involved a high-speed police chase of the driver of a potentially stolen truck who had backed into the police officer's car—almost hitting the two officers who had arrived to investigate. *Id.* at 567. The chase reached speeds up to 100 mph as the fleeing suspect turned off the truck's lights, ran stop lights and stop signs, and drove on the sidewalk and shoulder of a highway. *Id.* at 568. The Seventh Circuit accepted the parties' argument—without deciding the issue--that the intent to harm standard and not a stricter standard applies in determining the City's liability when the fleeing suspect and not the police officer causes another driver's death. *Id.* While the plaintiff argued that the deliberate indifference standard should apply, the court determined that the high-speed police chase presented an emergency and concluded that plaintiff's claim failed under the intent to harm (or some higher) standard. *Id.*

Plaintiffs compare this case to *Flores v. City of South Bend*, 997 F.3d 725 (7th Cir. 2021). In *Flores*, the Seventh Circuit applied the deliberate indifference standard to a nonemergency police pursuit which resulted in an officer-caused death. *Id.* at 729-30. In *Flores*, two officers noticed a speeding vehicle and radioed that they planned to stop it. *Id.* at 728. An officer who was not one of the five officers assigned to the tactical unit in the area traveled at speeds as high as 98 mph to join a "routine traffic stop," when none of the other officers indicated the situation involved an emergency, no officer asked for the responding officer's assistance, and no other officer pursued the driver immediately. *Id.* at 728. The responding officer crashed into the driver's vehicle, which was proceeding lawfully at an intersection, killing her. *Id.*

Upon reviewing the record, the Court is unable to conclude this case is particularly similar to *Flores*. In fact, the two cases are distinguishable on most important points. *Flores* involved a high-speed chase of an alleged speeder that was engaged in by an officer whose presence was not requested by the five officers assigned to the applicable task force. Conversely, as a member of the SCU, Wilkerson was instructed by a member of the Pro Active Crime Unit to be on the lookout for a specific Dodge Challenger and to identify the driver, who was believed to be selling drugs. Thus, the crime believed to have been committed here is far more serious than the speeding involved in *Flores*. The chase in *Flores* reached speeds as high as 98 mph in residential areas. The parties in this case report that the police chase only reached speeds of 45 to 47 mph. In *Flores*, the officer ran a red light at an intersection, killing the driver of the other vehicle. In contrast, it was not the squad car but the driver of the Dodge Challenger that drove erratically before hitting Plaintiffs' vehicle. The occupants of Plaintiffs' vehicle were injured, not killed. Aside from both crashes occurring at night, the cases do not appear to have many similarities.

Plaintiffs cite *Flores* and two other cases in support of their assertion this was a non-emergency police pursuit. In *Hill v. Shobe*, 93 F.3d 418 (7th Cir. 1996), the Seventh Circuit applied the criminal recklessness standard to a case involving an on-duty police officer who ran a red light and struck another car, killing the driver. *Id.* at 419-20. This occurred after midnight and the officer was not responding to an emergency situation and ran the red light while driving without his headlights, emergency lights, or siren activated. *Id.* In *Lisby v. Henderson*, 74 F.4th 470 (7th Cir. 2023), the criminal recklessness standard was applied when a police officer driving to work and not on an emergency call

struck and killed a pedestrian who was on the shoulder of a highway. *Id.* at 471-73. Hill and Lisby are factually distinguishable from the chase of a suspected drug dealer that occurred in this case.

The Seventh Circuit recently discussed emergency and non-emergency situations:

> Gayl also argues that this case was a nonemergency because Sgt. Rider had the opportunity to deliberate and considered terminating the pursuit. But Sgt. Rider's brief consideration of whether to terminate the pursuit does not rise to the level of actual deliberation required to constitute a nonemergency situation. Rather, nonemergency situations require opportunity for forethought and the luxury of having time to make unhurried judgments, upon the chance for repeated reflection, largely uncomplicated by the pulls of competing obligations. Sgt. Rider's opportunity for consideration was anything but. In deciding to call off the pursuit, he was faced with a dangerous, fluid situation, in which he was forced to make decisions in haste, under pressure, and without the luxury of a second chance. When government officers face the sort of unforeseen and rapidly changing circumstances that demand unreflective decisions with potentially grave consequences on every side, an emergency situation exists, and deliberate indifference is not the applicable standard. That was the case here for Sgt. Rider.

*Flynn*, 148 F.4th at 569-70 (internal citations and quotation marks). Plaintiffs cite no cases in support of their assertion that a police pursuit of a suspected drug dealer is a non-emergency. Obviously, the chase was a fluid situation taking only a few minutes that did not allow for careful deliberation of whether to terminate the pursuit. Therefore, deliberate indifference is not the appropriate standard in this case.

The Seventh Circuit recently suggested that in cases where the injury was caused by a fleeing suspect and not the police, something stricter than "intent to harm" may apply when assessing the officers' liability. *See Flynn*, 148 F.4th at 568. ("Although this case does not neatly map onto those standards—here, the fleeing suspect, not the police,

caused Edward's death—the officers and the City nevertheless argue that we should assess their Fourteenth Amendment liability for an intent to harm rather than under an even stricter standard.") "No matter whether we look for an intent to harm or something more, Gayl's claim fails." *Id.* Based on the foregoing, the Court concludes that intent to harm is the appropriate standard to use.

Nothing about the police chase can accurately be described as shocking the conscience or evincing an intent to harm Plaintiffs. It appears a fairly routine pursuit of a suspected criminal. There is absolutely no evidence that, during the chase, Wilkerson or any other officer had "an intent to cause physical harm" that was "unrelated to the legitimate object of arrest" and "unjustifiable by any government interest." *Flynn*, 148 F.4th at 568. Defendants are entitled to summary judgment to the extent that Plaintiffs' claims relate to the chase of the Dodge Challenger.

Plaintiffs' argument is stronger as it relates to their claims concerning the events after the crash. Perhaps thinking about the recent pursuit that resulted in an Internal Affairs investigation and his suspension, Wilkerson did not return to the scene despite seeing the Challenger collide with another vehicle. According to Davis, Wilkerson decided they could not return because they had been chasing another vehicle. By not returning to the scene, Wilkerson and the other officers delayed rendering any necessary immediate aid to the driver of the Challenger or the then-unknown occupants of the vehicle it collided with.

Davis and Collier both told Wilkerson they had to go back to the scene of the crash. When Collier attempted to report the crash, Wilkerson told him not to. Certainly, nothing

that Davis or Collier did after the crash shocks the conscience or shows an intent to harm Plaintiffs. While Wilkerson presents a closer case, it is apparent from the record that his actions were motivated entirely by selfish concerns—avoiding an Internal Affairs investigation and potential suspension—and not because he intended to harm Plaintiffs or anyone else. Also, there is no evidence that delay in treatment caused any additional harm to Plaintiffs or that the officers intended for harm to occur based on their refusal to return to the scene of the crash. The record indicates help arrived at the scene fairly quickly when at least two witnesses to the crash reported it almost immediately. The officer's effort at self-preservation to avoid potential accountability in this case does not rise to the level required to shock the conscience.

Plaintiffs' Fourteenth Amendment claims under § 1983 fail because Plaintiffs cannot show Defendants had a purpose to cause harm or engaged in conduct that shocks the conscience. Therefore, Defendants are entitled to summary judgment on Counts I and II. *See e.g., Town of Castle Rock, Colorado v. Gonzales*, 546 U.S. 748, 768-69 (2005) (Although the framers of the Fourteenth Amendment and the Civil Rights Act of 1871, 17 Stat. 13 (the original source of § 1983), did not create a system by which police departments are generally held financially accountable for crimes that better policing might have prevented, the people of [Illinois] are free to craft such a system under state law."). Because there is no underlying constitutional violation, Plaintiffs' *Monell* claim also fails and Defendants are entitled to summary judgment on Count VII. *See Word v. City of Chicago*, 946 F.3d 391, 395 (7th Cir. 2020).

Based on Plaintiffs' agreement to dismiss their § 1985 conspiracy claims, no federal claims remain. The normal practice within the Seventh Circuit is that, if all federal claims are dismissed before trial, the district court should relinquish jurisdiction over any supplemental state law claims "in order to minimize federal judicial intrusion into matters of purely state law." *Burritt v. Ditlefsen*, 807 F.3d 239, 252 (7th Cir. 2015); *see also* 28 U.S.C. Sec 1367(c)(3). The Court finds no basis to depart from that general practice and will dismiss Plaintiffs' state law claims without prejudice.

## IV. CONCLUSION

For the reasons stated herein, Defendants' Motion for Summary Judgment (Doc. 58) is GRANTED. Counts I, II, III, IV, and VII are Dismissed with Prejudice. The Court relinquishes jurisdiction over the remaining state law claims, which are Dismissed without Prejudice. The Court will enter judgment in this consolidated action and terminate the case.

ENTER: September 22, 2026

COLLEEN R. LAWLESS
UNITED STATES DISTRICT JUDGE